**Mary GLASS, Plaintiff-Appellee,**

v.

**PETRO–TEX CHEMICAL CORP., Defendant-Appellant.**

**No. 84–2164.**

United States Court of Appeals, Fifth Circuit.

April 22, 1985.

Baker, Smith & Mills, Lawrence J. McNamara, Dallas, Tex., for defendant-appellant.

George C. Dixie, Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GOLD-BERG, and TATE, Circuit Judges.

TATE, Circuit Judge:

The plaintiff Mary Glass filed a sex-discrimination suit against her former employer, Petro-Tex Chemical Corporation ("Petro-Tex"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* She contended, inter alia, that Petro-Tex refused to promote her to payroll manager in 1969 and again in 1974 because she was a woman and that the company constructively discharged her in 1974 in retaliation for complaints she made regarding the company's allegedly discriminatory treatment. Following a bench trial, the district court entered a final judgment for Ms. Glass, awarding her $60,466.61 in back pay and ordering her reinstatement to employment. Petro-Tex appeals.

On appeal, Petro-Tex argues that the following findings of fact entered by the district court are clearly erroneous: (1) that the company intentionally discriminated against Ms. Glass; (2) that the company engaged in a "continuing violation" of Title VII between 1969 and 1974; (3) that the company constructively discharged Ms. Glass in 1974; and (4) that Ms. Glass had sufficiently mitigated her damages following the constructive discharge through her mainly unsuccessful efforts to secure other employment. Petro-Tex further argues that the district court abused its discretion in awarding Ms. Glass $40,987.50 in attorneys' fees. We find no reversible error in the district court's factual findings and no abuse of discretion in its award of attorneys' fees. Accordingly, we affirm.

*Factual Background and Proceedings Below*

During the relevant time (1967–1974):

The employer Petro-Tex was a manufacturer of petro-chemical products in Houston, Texas. It employed about one thousand people. More than half were unionized employees who received hourly wages. The remaining some 350 employees were salaried employees, including the 50 females employed as non-supervisory office and clerical workers, with the exception of a few female accountants.

Ms. Glass, the plaintiff, was a salaried employee. Salaried employees were governed by no formal seniority system, personnel policy, or lines of progression. No tests for job skills were administered to evaluate employee performance. With regards to promotions, no formal system of posting and application was followed. Promotions were granted upon a supervisor's subjective assessment and recommendations to his superior. *However, it was company policy to look within the department to make promotions from below.*

Ms. Glass worked within the Treasury Department, in which decisions as to promotions and salaries were made by Harold Buchtler, the Treasurer. Ms. Glass was hired by Petro-Tex as payroll clerk in 1967, based on eight years highly recommended service in the payroll departments of other corporations, culminating in her promotion there to chief payroll clerk. From 1967 to 1974, when her employment with Petro-Tex terminated, Ms. Glass received merit raises uniformly, and the record reflects that, until shortly before she left Petro-Tex, she was uniformly regarded as a conscientious and well-qualified employee, who performed her responsibilities with initiative and dedication.

This litigation arises out of the failure of Petro-Tex, through Buchtler (the Treasurer and promoting authority), to even consider Ms. Glass for promotion to Payroll Manager (or Paymaster), despite her known ambition to receive this promotion, on the three occasions in which the position fell vacant during her employment. Ms. Glass alleged that the failure to consider her was solely because she was a female. When she expressed this view to company superiors on the occasion of the last vacancy, she alleges (and as held by the district court) that her supervisors made her working conditions so intolerable that she resigned (*i.e.*, was constructively discharged).

*The District Court's Factual Findings*

In its factual findings, the district court specifically fully credited Ms. Glass's testimony, as corroborated by the testimony of some co-employees and some admissions in the generally unfavorable testimony of Petro-Tex witnesses, primarily managerial employees or supervisors. The district court's factual findings evidence that it did not give credit to the testimony of Petro-Tex witnesses to the contrary of its findings.

The district court found:

(1) Buchtler, the Treasurer and appointing authority, was biased against women and believed they should be given no initiative. He routinely promoted men over women. Within the Treasury Department, no woman had ever held a supervisory or managerial post during the period of Ms. Glass's employment. Because Buchtler was sexually biased against women, he did not even consider Ms. Glass for promotion to Paymaster on the occasions of the three vacancies, although she was well qualified to receive the promotion. On each occasion, deviating from the ordinary company policy of promoting from within, he went outside the department in order to find a male to fill the vacancy.

(2) Moreover, on at least two of the occasions, Buchtler chose a male less qualified than Ms. Glass to fill the vacancy. The vacancies arose and were filled as follows:

*(a)*

Ms. Glass had been hired in early 1967 as an intermediate payroll clerk and received merit raises and a promotion to Payroll Clerk by December 1968, just before her first paymaster (Wehunt) left the company. About a month before he departed in September 1969, she learned that a male (Pryhoda) from outside the Treasury Department was to be named as Wehunt's successor. She expressed her disappointment and inquired of Wehunt why she had been passed over, and the latter replied, "Because they want a man." Pryhoda had been an employee in the Accounting Department since 1951, had no payroll experience, and was in poor health. During Pryhoda's brief tenure, Ms. Glass had to teach him his work and, sometimes, to do his work for him. Ultimately, on May 1, 1970,

he was relieved of his duties, and he was subsequently demoted to payroll clerk. The district court found that Pryhoda was less qualified than Ms. Glass to become the Payroll Manager.

### (b)

Pryhoda's demotion created the second vacancy. Again reaching outside the department, despite Ms. Glass's expressed interest in the promotion, Buchtler appointed as Payroll Manager on May 1, 1970 Barziza, an assistant personnel manager (1964–1970) in the Industrial Relations Department. Barziza had served as paymaster and supervisor of payrolls in the Treasury Department from 1945–1964. Ms. Glass acknowledges that Barziza's qualifications were equal to or superior than her own, but she points out that—again—to avoid promoting her, Buchtler chose a male from outside the Department.

### (c)

Barziza, the new Paymaster, was planning to retire in May 1973. Despite Ms. Glass's known interest in filling the vacancy, in July 1972 Buchtler, the Treasurer, transferred Donald Weidig from the Accounting Department and had him appointed as Chief Payroll Clerk July 1, 1972, with the intention of qualifying him to succeed Barziza. Weidig had first been employed by Petro-Tex in 1970 and had served as a property accountant until his transfer in 1972 to the Treasury Department as Chief Payroll Clerk. Weidig had a bachelor's degree in mathematics and a master's degree in education, and he was a capable person. Weidig had never applied for work in the payroll section, and he had no experience doing that work. Although holding a higher title and paid more than Ms. Glass, Weidig performed the same duties as she did, learning them on the job. When Barziza retired from the position, Weidig became the Payroll Manager on May 1, 1974.

Based on Ms. Glass's 15 years as an experienced and highly commended payroll clerk, as compared with Weidig's two-years' (partly as an apprentice-learner) and his training and experience in other fields only, the district court concluded that Weidig was less qualified to receive the appointment than was Ms. Glass. While we may have some question as to this particular conclusion, we nevertheless, ultimately affirm, as not clearly erroneous, the district court's finding that this reason given for the promotion of Weidig (his alleged superior qualifications [1]) over Ms. Glass was pretextual and that, instead, the primary reason for Weidig's transfer to Treasury and his promotion to Payroll Manager by Buchtler was to appoint a male rather than to promote from within the department a fully qualified female payroll clerk. The rule in this circuit is that a Title VII plaintiff can prove discrimination-based causation by showing that the employer's discriminatory intent was a "significant factor" in the allegedly illegal employment decision. *Whiting v. Jackson State University,* 616 F.2d 116, 121 (5th Cir.1980).

(3) Prior to Weidig's final appointment as Payroll Manager, in late 1973 Ms. Glass complained to her superiors of what she felt to be illegal discrimination against her because of her sex. Following this complaint, Buchtler and other superiors refused to talk with her. Subsequently, although she remained responsible for salaried payroll and for secretarial tasks after her transfer to another section of the Department with additional duties, the Petro-Tex superiors, in the district court's words, "deliberately gave excessive work to Ms. Glass in reaction to her opposition to sexual discrimination." Other employees corroborated her complaints of hostility, and one of them testified that it was reasonably apparent that her superiors were trying to get rid of her and would eventually fire her. Due to the intolerable atmosphere at Petro-Tex, Ms. Glass resigned on May 21, 1974, after Weidig's promotion over her on May

---

**1.** Two other reasons were also assigned for the appointment of Weidig over Ms. Glass, which the district court also found to be pretextual.

Without detailed discussion, we will simply state that this finding is far from clearly erroneous.

1, and on June 21, 1974 timely filed a complaint with the Equal Opportunity Commission, alleging sexual discrimination and constructive discharge.

■ (4) Following termination in May 1974 of her employment with Petro-Tex, Ms. Glass, a woman in her early fifties, was quite unsuccessful in securing other employment. She contracted with two employment agencies and submitted twenty-six job applications and, although she secured several jobs for a short period of time, was unable to secure permanent employment. The district court explicitly found that Ms. Glass exercised reasonable diligence in seeking comparable employment until August 1977, when she ceased looking for work, and implicitly found that Ms. Glass left her interim jobs only because of extenuating circumstances. Petro-Tex had the burden at trial of establishing, in mitigation of its liability for backpay that Ms. Glass did not exercise due diligence in seeking comparable employment following her constructive discharge. *Marks v. Pratco, Inc.*, 633 F.2d 1122, 1125 (5th Cir.1981). We are unable to find that the district court committed reversible clear error in finding that Petro-Tex did not meet this burden. *See, id.*, 633 F.2d at 1125.

## DISCUSSION

### I.

In extremely persuasive briefs and argument, Petro-Tex attacks these factual findings as clearly erroneous. Indeed, absent the district court's superior opportunity for demeanor evaluation and the deference required on appeal to its factual evaluations and reasonable factual inferences drawn from the evidence, we would be troubled as to two of the above factual findings: (a) that Weidig's 1974 promotion was motivated by Buchtler's bias against promoting women employees rather than by Weidig's qualifications; and (2) that, following termination of her Petro-Tex employment, Ms. Glass's efforts to secure other employment (in mitigation of damages to be owed her

by Petro-Tex) were sufficiently diligent and dedicated.

■ However, an appellate court is not free to reweigh the evidence or to re-evaluate credibility of witnesses or to substitute for the district court's reasonable factual inferences from the evidence other inferences that the reviewing court may regard as more reasonable. *Pullman-Standard v. Swint*, 456 U.S. 273, 284, 102 S.Ct. 1781, 1788, 72 L.Ed.2d 66 (1982). "Findings of fact shall not be set aside [on review] unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a).

We have consistently construed this rule to mean that:

> A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. Where the evidence would support a conclusion either way, a choice by the trial judge between two permissible views of the weight of the evidence is not clearly erroneous, and the fact that the trial judge totally rejected an opposed view impeaches neither his impartiality nor the propriety of his conclusions.

*Griffin v. Missouri Pacific Railroad Company*, 413 F.2d 9, 12–13 (5th Cir.1969) (*quoting Chaney v. City of Galveston*, 368 F.2d 774, 776 (5th Cir.1966)). *See also Croy v. Campbell*, 624 F.2d 709, 710–11 n. 1 (5th Cir.1980). We have also consistently stated that "[t]he burden of proving that the findings are clearly erroneous is ... on the party attacking them." *Griffin, supra*, at 13. *See also Gupta v. East Texas State University*, 654 F.2d 411, 414 (5th Cir.1981).

■ Evaluated by these standards, although we admit the issue may be close in the two respects noted, we are unable to hold that the district court's findings are clearly erroneous as to intentional discrimination in the 1969 and 1974 promotions, as to the "continuing violation" by sexual discrimination that they manifest (see II be-

low), as to the constructive discharge, or as to Ms. Glass's requisite mitigation of her damages.

## II.

In awarding Ms. Glass back-pay relief, the district court found that Petro-Tex's policy against promoting women manifested a "continuing" violation from 1969 through the last discriminatory denial of promotion to Ms. Glass in 1974, so that the failure to promote in May 1974, a month before the EEOC charge, was a present violation, a discrete act of discrimination, sufficient to trigger the time within to file the discrimination charges with the Commission under Title VII.

Accordingly, as the back-pay remedy, the district court did not award Ms. Glass back pay (the difference between the paymaster's salary and Ms. Glass's actual earnings) simply from the date of discriminatory denial of promotion in 1974. Instead, reasoning that Ms. Glass had been the victim of employment discrimination from the denial of the first promotion in 1969 to the end of her employment immediately following the 1974 denial of promotion—because of Petro-Tex's continuing policy disfavoring promotion of women to supervisory positions—the district court awarded her back-pay as damages during the entire period (but see note 4 *infra*) and for the period following her 1974 constructive discharge until her efforts to secure reemployment ceased in 1977.[2]

The contention that the district court erred in this "continuing violation" holding is, we think, the most substantial contention on this appeal. However, in the particular configuration of facts now before us, we conclude that the district court's determination in this regard is essentially factual and, thus, is affirmed as not clearly erroneous.

The parties agree that, since Ms. Glass did not file her charge with the Equal Employment Opportunity Commission ("Commission") until June 21, 1974, Title VII's statute of limitations bars her claim for relief for the discriminatory failure to promote her in 1969,[3] unless that failure was part of a "continuing violation" of Title VII. As noted, the district court found a continuing violation and therefore no bar to recovery.[4] We agree.

On at least three occasions, we have stated that the "[c]ase law on the subject of continuing violations [is] 'inconsistent and confusing' ...." *Dumas v. Town of Mount Vernon*, 612 F.2d 974, 977 (5th Cir. 1980); *Scarlett v. Seaboard Coast Line Railroad Co.*, 676 F.2d 1043, 1049 (5th Cir.1982); *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 979 n. 11 (5th Cir.1983). The core idea, however, is that "[e]quitable considerations may very well require that the filing periods not begin to run until facts supportive of a Title VII charge or civil rights action are or should be apparent to a reasonably prudent person similarly situated." *Dumas, supra,* 612

**2.** The district court reached this award as follows: It first determined the pay of the person who held the payroll manager position from 1972 (*see* note 4) to 1977 that, under its findings, Ms. Glass had been entitled to hold. From that figure, it subtracted Ms. Glass's actual earnings during the period from Petro-Tex and subsequent employers, arriving at a net award of some sixty thousand dollars. Although Petro-Tex quibbles at some of the figures, we are unable to find reversible clear error in the factual holdings that resulted in this net award.

**3.** In 1969, a Title VII plaintiff had 90 days to file her claim. In 1972, Congress amended Title VII to require filing within 180 days. 42 U.S.C. § 2000e–5(e). *See United Air Lines, Inc. v. Ev-*

*ans,* 431 U.S. 553, 555 n. 3, 97 S.Ct. 1885, 1887 n. 3, 52 L.Ed.2d 571 (1977). The Supreme Court recently held in *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982), that the 180 period functions as a statute of limitations rather than as a prerequisite to subject matter jurisdiction.

**4.** The district court properly held that, even though Ms. Glass is entitled to recover on her 1969 claim, her recovery is limited to the two-year period prior to the filing of the charge with the Commission—the period between June 21, 1972 and June 21, 1974. 42 U.S.C. § 2000e–5(g). *See Berry v. Board of Supervisors of L.S.U.,* 715 F.2d 971, 980 (5th Cir.1983).

F.2d at 978.[5] " 'The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights.' " *Id.* At the same time, "the mere perpetuation of the *effects* of time-barred discrimination does not constitute a violation of Title VII in the absence of independent actionable conduct occurring within the statutory period" (which is now 180 days). *Trevino v. Celanese Corporation,* 701 F.2d 397, 403 n. 7 (5th Cir.1983) (emphasis in original). *See generally,* 2 A. Larson, *Employment Discrimination* § 48.54(c) (1984).

Thus, Ms. Glass would establish that a continuing violation occurred by showing (1) that some "independent actionable conduct" occurred during the statutory period (here, the 1974 non-promotion) and (2) that she did not know and could not reasonably be expected to have realized that the 1969 discrimination was itself actionable until within 180 days of the date that she filed her charge with the Commission. With regard to this second requirement, our circuit jurisprudence has noted that prohibited employment discrimination in promotion and transfer may often be a continuing violation. *Trevino v. Celanese Corporation, supra,* 701 F.2d at 402, and decisions there cited. A persisting and continuing system of discriminatory practices in promotion or transfer produces effects that may not manifest themselves as individually discriminatory except in cumulation over a period of time. *Id. See also Clark v. Olinkraft, Incorporated,* 556 F.2d 1219

(5th Cir.1977), *cert. denied,* 434 U.S. 1060, 98 S.Ct. 1251, 55 L.Ed.2d 772 (1978). In this context, "[t]he persistence of a system of promotion and transfers ... animated by a spirit of unlawful discrimination constitutes a continuing violation of Title VII." *Trevino, supra,* 701 F.2d at 403, n. 7.

The district court found, and we agree, that Petro-Tex discriminated against Ms. Glass on May 1, 1974, when the company chose Weidig to be payroll manager. This act of discrimination constituted independent actionable conduct within the statutory period. Petro-Tex argues, however, that no pre-existing continuing violation occurred because Ms. Glass knew or should have known of the 1969 discrimination by no later than November 15, 1973, the date on which she was transferred to another section of the Treasury Department. Petro-Tex contends that, since Ms. Glass failed to file a charge with the Commission within 180 days of that date, her 1969 claim is time-barred.[6]

Petro-Tex alleges that there are three separate events that show Ms. Glass either knew or should have known of the 1969 discrimination more than 180 days before she filed her charge with the Commission. The first event occurred in 1969, when her supervisor Wehunt told Ms. Glass that she would not be named to replace him because Petro-Tex wanted his replacement to be a man. The second occurred sometime in 1971, when Ms. Glass

---

**5.** In *Berry,* we identified three factors that are relevant to determining whether a continuing violation has occurred: "The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (*e.g.,* a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision?" *Berry, supra,* 715 F.2d at 981. In the present case, the subject matter (promotion to payroll manager) is the same, but the acts of discrimination (failure to promote) did not occur frequently. We also stated in *Berry* that the "third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, ...?" *Id.* We view this third factor as

embodying the "core idea" expressed in the text, *supra.*

**6.** Petro-Tex further contends that Ms. Glass waived her right to seek recovery for the continuing violation by waiting until she submitted her pre-trial order to assert such a right. We disagree. In *Nevels v. Ford Motor Company,* 439 F.2d 251, 257 (5th Cir.1971), we stated: "While it is generally true that leave to file amendments should be freely given, Fed.R.Civ.P. 15(a), amendments should be tendered no later than the time of pretrial, unless compelling reasons why this could not have been done are presented." In light of this principle, we cannot say that the district court abused its discretion in allowing Ms. Glass to amend.

told another supervisor that she, rather than Pryhoda, should have received the 1969 promotion. The third occurred in late 1973, shortly before Ms. Glass was transferred to the other section, when she complained to her supervisor that the failure to promote her in 1969 was an illegal act of discrimination. Ms. Glass herself testified at trial that each of these events occurred.[7]

Petro-Tex's argument is persuasive but not compelling. The district court in essence found that Ms. Glass did not have actual knowledge that she had been intentionally discriminated against in 1969 until Buchtler, the Treasurer, promoted Weidig over her in May 1974. Prior to that time, Ms. Glass doubtless suspected she had been discriminated against. No concrete evidence of knowledge, however, as opposed to mere suspicion has been identified—no admission of knowledge at trial, for example, and no claim by a Petro-Tex superior of having verified Wehunt's 1969 statement to Ms. Glass. As late as the trial below, Petro-Tex contended, as it does on appeal, that Pryhoda was appointed over Ms. Glass in 1969 because he was more qualified by his general educational background. Petro-Tex simply points to the three events described above. Given this, the district court declined to find that Ms. Glass' suspicions were tantamount to knowledge of actionable intentional discrimination. In our view, this is not clearly erroneous.

The more difficult question is whether, given her suspicions, Ms. Glass should have realized that the 1969 non-promotion was discriminatory at a later date that was more than 180 days before she filed her charge with the Commission. We think Ms. Glass' appreciation of what happened in 1969 is best understood in light of the

ancient maxim "One swallow does not make a spring." Aristotle, *Nichomachean Ethics*, (Book I) (Athens, Greece; *circa* 340 B.C.). A reasonably prudent employee, one who is reasonably ambitious, conscientious, and trusting, as the record reveals Ms. Glass to have been, will not necessarily conclude that her employer is an illegal discriminator on the basis of one conversation (based on hearsay) and one act that is at least arguably non-discriminatory. Without additional evidence, she is just as likely as not to give her employer the benefit of the doubt and, in so doing, strive to disconfirm her own suspicions.

Here all that Ms. Glass had to go on, prior to being denied a promotion a second time in May 1974, was a single hearsay statement by Wehunt and the consequent promotion of Pryhoda in 1969. Nothing in the record suggests that any other supervisor or manager at Petro-Tex ever verified Wehunt's allegations or confirmed Ms. Glass' suspicions. What is more, following her conversation with Wehunt, Ms. Glass continued to work conscientiously, received annual merit-pay increases, and, as the evidence suggests, continued to hope that her efforts would be rewarded. Taking all of this into account, the district court in essence found that Ms. Glass need not have known of the 1969 discrimination as actionable, and need not have abandoned her hopes for a promotion, until she was discriminated against again, in 1974, at which time she finally realized that her desire for promotion was hopeless because of Petro-Tex's continuing policy against promotion of women to supervisory positions in the Treasury Department.

We are unable to hold that these findings are clearly erroneous and, therefore, reversible.[8]

---

**7.** Although there is some dispute as to whether Ms. Glass discussed the 1969 promotion with her superior in both 1971 and 1973, or only in one or the other of those years, or perhaps only in 1972, we interpret the district court as having found that two discussions took place—one in 1971 and the other in 1973. We think, moreover, that the record supports this finding.

**8.** Petro-Tex argues that this case is indistinguishable from *Dumas v. Town of Mount Vernon*, 612 F.2d 974 (5th Cir.1980), where we found no continuing violation. In *Dumas*, the plaintiff wrote the Commission a letter on May 22, 1975, to supplement a discrimination charge she had filed the previous year. Nearly two years passed before the Commission issued her a right to sue letter, and it was not until March 1977

### III.

Petro-Tex's remaining contention is that the district court abused its discretion in the amount of attorneys' fees awarded.

The district court reviewed Ms. Glass' request for attorneys' fees in light of the twelve factors articulated in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir.1974). After doing so, the court awarded Ms. Glass $40,987.50. Petro-Tex contends that this amount is excessive for several reasons: (1) because the hourly rate of trial counsel ($150) was too high; (2) because the district court failed to distinguish between in-court and out-of-court time; (3) because trial counsel had little experience in handling sex-discrimination cases; and (4) because many of the hours spent preparing for trial were duplicative.

As we stated in *Welch v. University of Texas*, 659 F.2d 531, 535 (5th Cir.1981), "[t]he district court has broad discretion in awarding attorney fees; the amount will be altered only in the event of a clear showing of abuse of discretion." *See also Chescheir v. Liberty Mutual Insurance Company*, 713 F.2d 1142, 1150 (5th Cir.1983). We have considered the district court's evaluation of the *Johnson* factors and find ample support in the record for the court's award. We therefore conclude that Petro-Tex has failed to make a clear showing of abuse of discretion.

### IV. *Conclusion*

Accordingly, we affirm the decision of the district court.

AFFIRMED.

that she filed suit. In her complaint, she argued, inter alia, that the town of Mount Vernon, Alabama had refused to hire her because of her race. Stating that "the statutes of limitations applicable to actions under §§ 1981, 1983, 1985(3) and 1986 [all one year in *Dumas*] are not tolled while an EEOC claim is pending," *Dumas, supra*, at 979, we declared that the plaintiff's claim was time-barred unless she could establish a continuing violation. We concluded, however, "that [her] claim was properly dismissed since it affirmatively appears from [her] May 22, 1975, letter to the EEOC … that she viewed the Town's decision not to fill the vacancy as a discriminatory refusal to hire her." *Id.* at 978. By contrast, not only does the present case involve oral communications but, more important, the district court here implicitly found that these communications did not indicate that Ms. Glass knew or should have known that she had been discriminated against more than 180 days before she filed her charge. This was a factual determination. Although we might view the communications differently were we considering the matter *de novo*, the district court's finding is not clearly erroneous.