**UNITED STATES of America for the Use and Benefit of CONTROL SYSTEMS, INC., Plaintiff-Appellee,**

**v.**

**ARUNDEL CORPORATION, et al., Defendants-Cross Defendants-Appellants, Cross-Appellees,**

**v.**

**LAR ELECTRIC, INC., Defendant-Cross Plaintiff-Appellee, Cross-Appellant.**

No. 85-4948.

United States Court of Appeals, Fifth Circuit.

April 10, 1987.

Paul W. Killian, David C. Mancini, Vienna, Va., for Arundel Corp.

Claude A. Chamberlin, Aberdeen, Miss., Guin, Bouldin & Alexander, William M. Bouldin, Russellville, Ala., for Lar Elec., Inc.

Grady F. Tollison, Lauren Gordon Alexander, Oxford, Miss., for plaintiff-appellee.

Before RUBIN, JOHNSON, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In this action under the Miller Act, 40 U.S.C. § 270a et seq., a general contractor, the electrical subcontractor, and their sureties appeal the district court's findings of liability and dismissal of their cross-actions and counterclaims. We affirm in part, reverse in part, and reverse and remand in part.

## I. BACKGROUND

Defendants The Arundel Corporation, Guy F. Atkinson Company, and Gordon H. Bell, Inc., d/b/a Dillingham Heavy Construction, Inc., joint venturers (hereinafter referred to as Arundel), contracted with the Army Corps of Engineers in 1978 for the construction of Lock B of the Tennessee-Tombigbee Waterway Project in Smithville, Mississippi. As general contractor, Arundel subsequently entered into a subcontract with defendant Lar Electric, Inc. ("Lar"), whereby Lar would perform certain electrical, instrumentation, control, and communications work on the project. Lar subsequently contracted with Control Systems, Inc. ("Control") for the purchase of certain control and electrical power systems for the project.

On April 25, 1979, the Corps issued Change Order Request No. C–21 to Arundel, and the changes required by C–21 drastically affected the SCADA[1] system to be installed by Control under the Lar subcontract. After a period of negotiations involving all the parties, the Corps issued the Notice to Proceed on C–21 to Arundel on November 5, 1980. Arundel delivered this notice to Lar some time later, and Lar delivered it to Control on May 3, 1981. Although the prime contract required the project to be "functionally operational" by January 18, 1982, the project was not accepted by the Corps as "functionally opera-

tional" until June 3, 1982, and the SCADA system and other work performed by Control were not substantially completed until August or September of 1982.

The Corps, acting pursuant to the prime contract, assessed liquidated damages of $70,720 against Arundel for untimely performance. In an attempt to recoup its losses, Arundel withheld from Lar $89,263 due under the subcontract, on the grounds that Lar was responsible for the project's delay. Making similar allegations, Lar subsequently refused to pay Control $132,-747.22 on the supply contract.

In June 1984, Control filed this action against Lar for breach of contract, including Arundel and its sureties as defendants under Arundel's Miller Act payment bond. Lar responded with a counterclaim against Control for breach of contract and a cross-action against Arundel for the $89,262.91 due under the subcontract. Arundel similarly filed cross-actions against Lar and a counterclaim against Control for approximately $200,000, representing Arundel's delay damages on the project.[2]

After a bench trial, the district court entered judgment for Control against Lar and Arundel for $132,747.22 plus interest and costs, and assessed $25,000 in punitive damages against Lar. The court also awarded Lar the $89,262.91 due under the subcontract, and dismissed the remaining counterclaims and cross-actions. Arundel and Lar now appeal.

## II. CLAIMS MADE BY ARUNDEL

### A. Arundel's Claim Against Lar

Arundel asserts claims against Lar for both the liquidated damages assessed by the Corps of Engineers and the increased overhead costs allegedly resulting from Lar's delay. Further, Arundel sought indemnification from Lar in the event Control prevailed on its Miller Act claim

---

1. SCADA is the acronym for Supervisory Control and Data Acquisition. Such a system involves sensors, television cameras, and a computer with associated software, and makes it possible for a single operator to control the dams and locks from the control center.

2. It is not disputed that Mississippi law governs the non-Miller Act claims in this case. See *United States for the Use and Benefit of Aucoin Electric Supply Company v. Safeco Insurance Co.*, 555 F.2d 535, 541 (5th Cir.1977).

against Arundel. We analyze each of these claims in turn.

*1. Liquidated Damages*—The prime contract between Arundel and the Corps of Engineers required the project to be "functionally operational" by January 18, 1982, and further provided for liquidated delay damages of $520 per day. As noted above, the project was not deemed "functionally operational" by the Corps until June 3, 1982, and thus Arundel was assessed liquidated damages of $70,720. Arundel charges that as the delay was caused by Lar or Lar's supplier Control, Lar is liable for this amount.

■ However, two crucial findings of the district court render Arundel's contentions on this point meritless. First, the court found that the project could become "functionally operational" without the SCADA system, and thus any delay in the completion of the SCADA system had no effect on the date the project became "functionally operational." Second, the court found that neither Lar nor Control did anything on the project after January 18, 1982 that would have affected the project's "functionally operational" status. As there is evidence in the record to support these findings of fact, we cannot say that they are clearly erroneous. See *Glass*

*v. Petro-Tex Chemical Corp.*, 757 F.2d 1554, 1559 (5th Cir.1985). Once these findings of fact are accepted, the district court's conclusion that neither Lar nor Control was responsible for the delay in the project's becoming "functionally operational" must also stand, and thus Arundel cannot look to Lar for the liquidated damages assessed by the Corps.[3]

*2. Overhead Damages*—The district court also found that, as a result of the delay in completing the SCADA system, Arundel incurred increased overhead expenses. However, the court found that Arundel was the "real culprit" whose actions caused the damages from the delay, because Arundel did not request an extension of time from the Corps after issuance of the C–21 change order. Arundel challenges this conclusion on the grounds that the subcontract, as a matter of law, made Lar liable for all losses or damages caused by Lar's untimely performance.

■ We agree. Under the subcontract,[4] it was incumbent on Lar to request any extension of time needed for the C–21 changes affecting Lar's responsibilities. See *Sime Construction Co. v. Washington Public Power Supply System*, 28 Wash. App. 10, 621 P.2d 1299 (1981). Whatever

---

3. We note that the impact of the district court's findings is to hold that the project was "functionally operational" on January 18, 1982, and thus the district court disagreed with the Corps' assessment of the project's status. We emphasize that the Corps' determinations were not binding on the court, and that there was evidence on both sides of this issue.

4. The subcontract provides:

Subcontractor agrees that he is fully informed concerning the terms and conditions of the General Contract and specifications and drawings and ... he agrees to be governed by each and all of the provisions and requirements of same in all of his operations, and to fully perform and comply therewith in the discharge of this subcontract, except as the terms and provisions thereof may be inconsistent with the terms of this subcontract, as though the same were set out here in full; and the Subcontractor does hereby assume towards the General Contractor all of the obligations and responsibilities that it, the said General Contractor, by its agreements assumes towards the Owner....

... if the Subcontractor shall delay the material progress of the work or if the same shall be delayed or retarded in connection with the Subcontractor's performance or non-performance of work hereunder, so as to cause any loss to the General Contractor shall become liable, the Subcontractor shall be liable to the General Contractor for such loss or damage. The prime contract between Arundel and the Corps, incorporated into the subcontract by the above language, requires the following procedure regarding changes:

If any change under this claim causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by this order, an equitable adjustment shall be made and the contract modified accordingly....

If the Contractor intends to assert a claim for an equitable adjustment under this clause, he must, within 30 days after receipt of a written change order ... submit to the Contracting Officer a written statement setting forth the general nature and monetary extent of such claim....

rights Lar may have had to an extension of time were waived when Lar failed to make a timely written request for an extension, and when Lar signed the C–21 change order without reservation. The district court expressly found that Lar's failure to give Control prompt notice to proceed with C–21 caused a delay in the completion of the SCADA system. Lar's untimely performance falls within the scope of the subcontract's delay damages provision.

While the district court found that Arundel had suffered increased overhead costs as a result of delay, it made no findings regarding the amount of such damages or delay attributable to Lar's actions. We therefore remand these issues to the district court for further findings.

■ *3. Indemnification*—Arundel and its sureties also sought indemnification from Lar in the event that Control prevailed in its Miller Act claim. This portion of Arundel's cross-action was summarily dismissed when the district court ruled that Lar was not in breach of the subcontract.[5] As the contract unambiguously requires the subcontractor to indemnify Arundel for "all damages, legal and other expenses" attributable to the subcontractor's work, we reverse that portion of the district court's judgment denying Arundel indemnification from Lar.[6]

### B. Arundel's Claims Against Control

Arundel has also asserted two claims against Control, on the grounds that Control's untimely performance was a breach of Control's contract with Lar, of which Arundel was a third party beneficiary, or alternatively that Control's performance under the contract was negligent. Arundel appeals the dismissal of these counterclaims.

As noted in Arundel's briefs and in its Answer and Counterclaim, the basis of these actions is the assertion that Control breached the Lar-Control contract. Because, as discussed *infra*, we remand the issue of the Lar-Control contract for further findings, we also remand Arundel's claims against Control.

### III. CLAIMS MADE BY LAR ELECTRIC, INC.

### A. Lar's Claims Against Control

In analyzing the conflicting contract claims between Control and Lar, the district court first sought to settle the "battle of the forms" issue of what constituted the contract between the parties; specifically, whether the delivery terms contained in Lar's purchase order controlled over the silence on delivery terms in Control's subsequent order acknowledgement. The court held that Control's order acknowledgement, expressly providing that its terms would govern the contract between the parties, controlled over Lar's purchase order. As Control's acknowledgement was silent concerning delivery dates, the district court found determinative the "reasonable time of delivery" assumed by Mississippi law in such circumstances. The court concluded that Control performed within a reasonable period and thus was not in breach.

■ Determination of a contract's terms is a question of law that this Court reviews *de novo*. See *Texas Commerce Bank v. National Royalty Corp.*, 799 F.2d 1081 (5th Cir.1986). The district court erred in its interpretation of Control's order acknowledgement. Rather than mandating that its terms control in every situation,

---

**5.** It appears that this aspect of Arundel's cross-action was simply "lost in the shuffle" of this complicated case. Control, joined by Arundel, filed a motion to correct this apparent mistake in the judgment, but as this appeal had already been taken and the error was more than a clerical one covered by Fed.Rule Civ.Proc. 60(a), the district court overruled Arundel's motion. However, the district court noted that, due to this error, the judgment does not reflect its intended apportionment of damages.

**6.** One court has apparently recognized the right of the general contractor to indemnity under the Miller Act itself. See *United States for the Use and Benefit of I. Burack, Inc. v. Sovereign Construction Co.*, 338 F.Supp. 657, 661 (E.D.N.Y. 1972) (recognizing contractor's right to offset and withhold payments to subcontractor after satisfying Miller Act liability to subcontractor's suppliers).

Control's acknowledgement actually provides as follows:

> ... our acceptance of [your order] is expressly conditional on your assent to the inclusion in the contract of the GENERAL PROVISIONS ON THE REVERSE SIDE, which shall control *in case your order does not treat these subjects, or in case of conflict with the provisions of your order.*

[Emphasis added]. The acknowledgement intended that its terms would control in case of conflicting provisions and where Lar's purchase order was silent, but in so doing it incorporated those provisions of Lar's purchase order that were not in conflict. It was undisputed that Control's acknowledgement was silent as to delivery times, but that Lar's purchase order contained the following regarding delivery:

> Upon approval submittal date [sic] of Lar Electric Inc. shall provide Control System Inc. and Gregory-Salsbury & Co., Inc. with a written release for manufacture and shipment to the jobsite. Delivery shall be between 14 weeks, but no more than 20 weeks, from date of release. Packaging and mode of transportation is to be coordinated with project manager to facilitate least prospect of damages and ease in unloading. If delivery is made more than 30 days after the established delivery period and said late delivery results in a delay in the job and liquidated damages being assessed against Lar Electric Inc. said damages shall be deducted from any amounts owing under this purchase order....

■ Thus, the contract between the parties was not, as the district court held, solely the terms and silences of Control's order acknowledgement—it was composed of the acknowledgement and those nonconflicting terms or Lar's purchase order. As Lar's delivery terms are not in conflict with those of the acknowledgement, they are part of the contract and control in this case.[7] We therefore remand to the district court for further findings on performance and breach under the Lar-Control contract.

### B. Lar's Claim Against Arundel

The district court found that Arundel owed Lar $89,262.91 under the subcontract, and this finding is not challenged on appeal. Lar is thus entitled to judgment against Arundel for this amount, subject to Arundel's right to set off the damages found on remand and Arundel's right of indemnity from Control's Miller Act claim.

### IV. CLAIMS OF CONTROL SYSTEMS, INC.

### A. Control's Miller Act Claim Against Arundel

The district court held that under the Miller Act, 40 U.S.C. § 270a et seq, Control was entitled to judgment against Arundel and its sureties for $132,747.22 plus interest. Arundel challenges this conclusion on the single ground that Control failed to establish notice and delivery as required by 40 U.S.C. § 270b(a).

At the close of Control's case, Arundel moved for a directed verdict on the basis that Control had failed to establish that it

---

**7.** While the words of the contract itself resolve this issue, White & Summers suggest that the identical result occurs under the UCC.

> Assume that buyer sends a document to seller and that the document provides for arbitration. Seller sends back an acknowledgment that is silent on the question of arbitration. Buyer's argument will be ... "seller's document was an acceptance of the terms on my document including the one dealing with arbitration." Moreover buyer will point out that Comment 6 [to UCC 2–207] clearly does not operate in this circumstance since there are no terms on the form that "conflict." Despite the argument that this outcome gives the buyer-offeror an unearned advan-

tage, we think that he is correct and that the terms contained in his document which are not contradicted by the acceptance become part of the contract.

J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code 31 (2d Ed.1980) (discussing UCC 2–207, codified in Mississippi as Miss.Code Ann. § 75–2–207).

This result also comports with Control's apparent interpretation of the contract with Lar. When Control ordered equipment from Executone, its principal supplier, the contract between those parties contained delivery terms identical to those in Lar's purchase order.

had given Arundel the ninety day notice required by the Miller Act.[8] The district court denied this motion because Arundel had not raised any issue of notice in the pretrial order, and thus was precluded from raising the issue at trial. However, the court allowed Control to reopen its case and present evidence of notice, whereupon Control introduced uncontroverted evidence that notice was given on March 25, 1983.

■ Arundel argues that the evidence presented is insufficient to establish notice under the Miller Act, because nothing in the record establishes that the last delivery of materials or last performance of services was within ninety days of the notice; i.e., that Control delivered supplies or performed services after December 25, 1982. However, Control introduced invoices showing delivery of technical manuals on January 17, 1983 and labor performed on January 15, 1983, well within ninety days of the notice.[9] As such, proper Miller Act notice was given, and Arundel is liable under its bond.

### B. Control's Claim Against Lar

The district court held that Lar owed Control $132,747.22 plus interest under the contract between the parties, and Lar, subject to the previously discussed counterclaim, does not dispute its liability on appeal. However, finding that Lar's refusal to pay was "so willful, wanton, and reckless as to amount to an independent tort," the district court assessed punitive damages against Lar in the amount of $25,000.

■ This award of punitive damages cannot stand. While Mississippi law does allow punitive damages in cases of breach of contract "where such breach is attended by intentional wrong, insult, abuse, or such gross negligence as amounts to an independent tort," *Tideway Oil Programs, Inc. v. Serio*, 431 So.2d 454, 465–66 (Miss.1983), it also recognizes that punitive damages are appropriate "only in extreme cases," as "a windfall ... deemed necessarily granted to the plaintiff as his reward for public service in bringing the wrongdoer to account." *Id.* at 460. We can find no Mississippi caselaw, and the parties have cited us to none, where punitive damages have been awarded in a breach of contract case without some special additional circumstances, such as fraud, breach of fiduciary duty, or grossly unequal bargaining power between the parties warranting close supervision by the courts (e.g., suits by an insured against his insurer).

None of these situations is presented here. This case is a not unusual breach of contract case with none of the public policy overtones that typically sound from Mississippi punitive damage cases. We are loathe to permit an expansion of Mississippi law beyond those situations clearly sanctioned by state courts. See *Gardner v. Jones*, 464 So.2d 1144, 1148–50 (Miss.1985) (disallowing punitive damages in case involving fraud and breach of lease). That portion of the district court's opinion imposing punitive damages upon Lar is therefore REVERSED.

### V. CONCLUSION

In Summation:

---

8. 40 U.S.C. § 270b(a) provides in relevant part: [A]ny person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed.

9. Arundel's assertion that invoices are insufficient as a matter of law to prove delivery under the Miller Act is without merit. The sole case proffered for this proposition, *Fidelity and Deposit Company of Maryland v. A to Z Equipment Corp.*, 258 F.Supp. 862 (E.D.N.Y.1966), does not discuss the basis for its conclusory disallowance of a claim, and we can locate no other case that suggests this approach. Certainly, a finder of fact can refuse to believe allegations of delivery evidenced solely by an invoice, but it does not follow that invoices are insufficient as a matter of law.

1. Arundel is entitled to recover from Lar those overhead damages attributable to Lar's delay in delivering the C–21 Notice to Proceed to Control. We REMAND to the District Court for findings on the amounts of such damages.

2. Arundel is entitled to indemnification from Lar for any amount Arundel should pay Control under Control's Miller Act claim.

3. Lar's claim against Control is REMANDED to the District Court for further findings in light of this opinion, and Arundel's claim against Control is similarly REMANDED.

4. Control is not entitled to punitive damages against Lar.

In all other respects, the judgment of the district court is AFFIRMED.

AFFIRMED in part, REVERSED in part, REVERSED and REMANDED.