# UNITED STATES COURT OF APPEALS
## For the Fifth Circuit

_____

No. 99-30391
SUMMARY CALENDAR

_____

JP MCCLEARY CONSTRUCTION, INC
Plaintiff-Appellant,

and

BOSTON OLD COLONY INSURANCE COMPANY
Intervenor-Plaintiff-Appellant,

OFFSHORE EQUIPMENT SALVAGE INC; ANGLO-AMERICAN INSURANCE COMPANY
Intervenor-Appellants,

v.

G & B MARINE INC; THE MISS BEATRICE MV, her engines, tackle, furniture, etc, in rem;
THE MR N BLANCHARD M/V, her engines, tackle, furniture, etc, in rem
Defendants-Appellees,

BLANCHARD TOWING CO, as owner of the M/V Mr. N Blanchard
Movant-Appellee.

_____

SMIT AMERICAS INC; OTTO CANDIES INC; INTERESTED HULL UNDERWRITERS OF
THE BARGE OC-260
Plaintiffs-Appellees,

v.

OFFSHORE EQUIPMENT SALVAGE INC; ET AL
Defendants,

OFFSHORE EQUIPMENT SALVAGE INC; JP MCCLEARY OFFSHORE CONSTRUCTION,
INC, in personam
Defendants-Appellants

v.

THE MR N BLANCHARD M/V, her engines, tackle, apparel, equipment, etc, in rem, BLANCHARD TOWING CO, in personam; THE MISS BEATRICE MV, her engines tackle, apparel, equipment, etc, in rem; G & B MARINE INC, in personam
Defendants-Appellees.

———————————————————

Appeals from the United States District Court
for the Eastern District of Louisiana
(93-CV-3264)

———————————————————

September 8, 2000

Before REYNALDO G. GARZA, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

PER CURIAM:[1]

## BACKGROUND

### A.    Procedural History

J.P. McCleary Offshore Construction, Inc. ("JPMOC") filed suit in federal district court against G & B Marine, Inc. ("G & B"), the owner of the tugboat MISS BEATRICE, and Blanchard Towing, Inc. ("BTI"), the owner of the tugboat MR. N. BLANCHARD, seeking to recover for property damage and economic losses resulting from the destruction of one of two offshore well jackets or "packages" that toppled into the inner coastal waterway near Houma, Louisiana while being lifted by JPMOC's derrick barge ("JPMACII"). At the time of the incident, the tugboats were secured to the JPMACII. Subsequently, Offshore Equipment and Salvage, Inc. ("OES"), the owner of the two "packages" which were to be offloaded, intervened in the litigation to recover its losses. Likewise, Boston Old Colony Insurance Company ("BOC"), the

---

[1]  Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

subrogated hull insurer for the JPMACII, intervened as well to recover amounts paid for damage to the barge.

In a separate action, Smit Americas ("SMIT") and Otto Candies, Inc. ("OCI"), interested hull underwriters, filed suit against J.P. McCleary, Anglo American Insurance Company, J.P. McCleary's liability insurer, Blanchard Towing, Inc., G & B Marine, Inc., and Offshore Equipment Salvage Co., Inc. On May 27, 1994, the two separate cases were consolidated.

Following the completion of discovery, the court chose to bifurcate the trial, with damages and limitation issues to be heard at a later date, if necessary. The issue of liability was tried beginning on February 19, 1997. On March 12, 1999, the district court granted judgment in favor of the defendants, G & B and BTI, and against the plaintiffs in the original suit filed by JPMOC. The court also granted judgment in favor of Smit and OCI, the plaintiffs in the second suit in the amount of $109,230.50 and against defendant JPMOC. From this adverse decision, JPMOC, BOC and OES appeal.

**B.     Facts**

In 1991 Pat McCleary, the owner and operator of JPMOC, decided that his company needed a deck barge to lift heavy loads. McCleary consulted naval architect Bruce Johnson to assist in converting the deck barge to a crane barge. Johnson advised McCleary on the technical aspects of creating the JPMACII. McCleary had insufficient capital to design and build a crane barge from scratch. McCleary contracted with Conrad Industries to build a standard deck barge. McCleary obtained a 175 foot boom at a salvage sale, which he intended to use as the critical lifting component of the JPMACII. The 175 foot boom was designed to mate with a barge shorter and wider than the one to be used for the JPMACII. McCleary purchased other

components such as gantry, deckhouse, winches, sheaves and pedestal cranes from marine yard sales, second-hand shops and salvage jobs.

In November of 1992, the JPMACII was launched as a deck barge. It was then towed to McCleary's yard in Morgan City, Louisiana to be outfitted with deck equipment. Once outfitted, the JPMACII stood 46 feet above the deck, the gantry was 38 feet tall and the boom was 175 feet. The U.S. Coast Guard and American Bureau of Shipping ("ABS") had only certified the JPMACII as a deck barge, not as a heavy lift crane barge. A load on the JPMACII could only be laterally shifted by movement of the whole barge by tugboat.

McMoran Exploration Company was the original owner of the four-legged well platforms at issue in this litigation. The platforms were no longer in use and were removed and sold to Offshore Equipment & Salvage, Inc. The platforms were then placed on the Candies deck barge (Barge OC-260) for transport to McCleary's Houma yard where they were to be offloaded by the JPMACII. McCleary contacted G & B and requested two tugs to assist in the offloading operations.

On May 18, 1995, the MR. N. BLANCHARD, a 480 horsepower inland pushboat owned by Blanchard and the M/V MISS BEATRICE, a 1,200 horsepower model bow tug owned by G & B, arrived at McCleary's site. The platforms were the largest lift ever attempted by the JPMACII. During the initial lift, the JPMACII was unballasted and developed a noticeable port side list or heel. Following the preliminary lift attempt, McCleary decided to ballast the barge. It was McCleary's intent to ballast the bow compartment and the three centerline compartments coming from the bow, eventhough, the barge already had a natural port-side list. McCleary delegated the ballasting to Michael Landry. Landry had never ballasted the barge before and did

not know how to do it and initially ballasted the wrong compartment. Experts at trial agreed that proper ballasting of the barge was an essential element of the lift operation. The testimony of Landry, Charles Werchan and Jules Schubert indicates that the ballast compartments were not completely full of water.

McCleary experienced problems with the port-side load which was not spooling properly, and the intense rubbing of the barge's lift cables aggravated one of the boom cross-benches. Charles Werchan, the crane operator did not have any formal experience, training or schooling as a crane operator and only worked as a part-time crane operator. Werchan did not remember seeing a load chart or operating manual for the crane on the JPMACII and did not know the crane's maximum safe working load. Werchan did not know the length of the crane boom or have any idea of what the maximum after load per book angle might be nor did he know if the crane had ever been inspected by a crane certified body. He testified that the crane did not have a boom angle or weight indicator for the crane in the control station where he was positioned.

When McCleary attempted for the second time to move the jacket to the dock, he told the two tug captains that the lines securing the JPMACII to Barge OC-260 were going to be released and, after his signal, the tugs were to "walk" the lift barge upstream and nose it into the bank so that the load could be released ashore. When the lines were released, the booming-up maneuver, winching-in, and misalignment in the center of gravity of the load caused the JPMACII to develop a list, and the platform started to swing upstream and into the port stern of the JPMACII. The port stern list continued to increase, exacerbated by the "free surface" or air in the ballasted compartments, until in the words of Captain Michael Badeaux, "everything started falling down." As a response, Captain Badeaux placed his tug in reverse to escape the falling boom and deck.

As the equipment began to fall upstream and to port, the momentum of the approximately 410-450 ton deck, in combination with the collapsing boom, pushed the stern of the JPMACII to starboard. The platform and boom then both fell into the waterway.

Captain Kelly Cantrelle, Master of the M/V EMERALD COAST, which was moored directly astern of the Barge OC-260 observed the whole operation and testified that as soon as the load was lifted, it began to fall to the port of the JPMACII setting in motion the chain of events which lead to the collapse of the boom. Captain Cantrelle confirmed that at no time did either of the tugs "power up" going forward as alleged by the McCleary witnesses. Captain Cantrelle also agreed that until moments before the accident, the load had remained partially supported by the deck barge all day.

The crews of the tug boats testified that they intended to follow the direction of McCleary and in no way departed from those instructions prior to the accident. Captain Badeaux and Blanchard testified that they never received an order to come ahead before the accident. Captain Cantrelle, who was monitoring Channel Six, confirmed that no order was ever given to the tug boats to start pushing. The testimony of the tug boat witnesses and the respective log entries indicate the lift off of the load and collapse of the boom occurred within moments after the mooring lines were released, and well before the tugs could even begin to push the JPMACII upstream. McCleary supervised all relevant operations concerning JPMACII. The district court found that McCleary had no experience as a lift engineer, a naval architect or a heavy lift operator and that McCleary and his witnesses' attempts to contradict the testimony of Captain Badeaux, Captain Cantrelle and Blanchard lacked credibility.

## ANALYSIS

This Court reviews a district court's findings of fact in a bench trial for clear error and findings of law *de novo*. *See Philips Petroleum Company v. Best Oil Fields, Inc.*, 48 F.3d 913 (5th Cir. 1995). A district court's findings of fact are not to be set aside unless they are clearly erroneous, with due regard being given to the opportunity of the trial court to judge the credibility of the witnesses. *See* Fed. R. Civ. P. 52(a); *see also C & B Sales & Services, Inc., v. McDonald*, 177 F.3d 384, 387 (5th Cir. 1999). The burden of demonstrating that the district court's findings are clearly erroneous is on the party attacking them. *See Glass v. Petro-Tex Chemical Corp.*, 757 F.2d 1554, 1559 (5th Cir. 1985).

On May 18, 1993, while the shear leg crane barge, the JPMACII, was lifting a 400-plus ton well jacket from the deck barge OC-260, the boom of the JPMACII collapsed, damaging the JPMACII, the deck of the OC-260 and the platform. JPMOC argues that the fall of the platform was the result of the tug boats disregarding JPMOC's instructions while pushing on the JPMACII. According to JPMOC, the G & B tug, the M/V MISS BEATRICE, which was pushing the barge from a position nosed into the box of the JPMACII, rotated the barge when the Blanchard tug, the M/V N. BLANCHARD, which was nosed into the starboard stern, stopped pushing altogether or went in reverse. The district court decided that McCleary's account of events lacked credibility, disbelieving that the two tugs, for reasons unknown, elected to wholly disregard McCleary's express instructions and, without signal or command, initiated conduct completely contrary to the nature of the operation underway.

The tug boat owners contend that the witnesses, exhibits and physical evidence show that the JPMACII was haphazardly designed and ill-constructed. They argue that these factors caused the incident, when combined with a load that exceeded the barges capacity, improper ballast and

lifting techniques, as well as manning by JPMOC's inadequately trained crew. The district court agreed, finding that the JPMACII was unfit to perform the lift that McCleary was attempting at the time of the casualty. Credibility determinations played an important role in the lower court's evaluation of the JPMOC and Old Colony claims. We find that the district court's decision to grant judgment in favor of the defendants G & B and Blanchard and against JPMOC was supported by the evidence presented at trial and therefore was not clearly erroneous.

Under the law of tug and tow, a tug is "neither a bailee nor an insurer of the tow. The tug is obligated to only use reasonably and ordinary care and skill and the burden of proving a lack of it is on the one who asserts such liability. Negligence must, therefore, be proved." *Stephen v. White City*, 285 U.S. 195 (1932). A tow owes an affirmative duty to the towing tugs to make the tow seaworthy. *See McDermott, Inc., v. Amclyde*, 1997 A.M.C 692 (E.D. La. 1996). "Seaworthy" means proper ballasting with cargo properly lifted in such a manner that a tow has sufficient reserve stability that it would be capable of withstanding the ordinary movements of the expected towing maneuver. *Id*.

The district court's reference to Coast Guard regulation 46 C.F.R. 170.285(a)(2) helped determine whether the JPMACII was seaworthy.[2] The district court found that JPMACII had little reserve stability and was not in compliance with the stability and operation of crane barges

---

[2] C.F.R. § 170.285(a)(2) provides:

(a) When doing the intact stability calculations required by this subchapter, the virtual increase in the vessel's vertical center of gravity due to liquids in tanks must be determined by calculating . . .

(b) The maximum free surface effect of each partially filled tank containing non-consumable liquids.

on navigable waters in the United States. The district court determined that McCleary's naval architect, Bruce Johnson, did not account for the maximum free surface effect for each partially filled tank containing non-consumable liquids, as required by 46 C.F.R. 170.285(a)(2). Furthermore, the district court concluded that the failure to account for the maximum free surface effect for each partially filled tank containing non-consumable liquids resulted in a significant deterioration in the reserve stability of the JPMACII.

Appellants urge that 46 C.F.R. 170.285(a)(2) is inapplicable and that the district court erred in creating a duty or standard of care based on that regulation. They maintain that the regulation concerns "rotating derricks used in offshore application when the vessel at issue was a fixed derrick barge and was being used in shore." The opinion of the court below does not indicate that the Coast Guard regulations were employed to establish negligence much less negligence *per se.* The regulation was cited as a guide in the determination of whether the JPMACII was seaworthy and fit for the operations at hand and to consider and test the basis of JPMOC's expert naval architect at trial on this point. The lower court properly considered the issue of "free surface" in the ballasting compartments in deciding whether the JPMACII was fit and otherwise seaworthy to perform the tasks at issue. In any event, the lower court did not rely or have to rely on the regulation or any of its subparts to conclude that the law fixed a particular standard of care on the part of JPMOC. The law of tug and tow set the applicable standard of care. Reference to the free surface in the ballasting compartments would apply regardless of whether the JPMACII was a fixed or a rotating crane barge or whether it was operating on the high seas or in protected waters. At trial, the experts agreed that proper ballasting and appropriate management of free surface in the interior compartments was an essential element of

the intended lift operation.

The JPMACII was inspected by the U.S. Coast Guard and had a Certificate of Documentation. However, for the particular configuration of the crane as installed by JPMOC, no advance authorization was either sought or obtained. After the casualty in question, the Coast Guard noted that it was unknown whether the design was adequate for the load that was lifted. The evidence presented at trial was insufficient to support JPMOC's contention that the JPMACII had proven capable of lifting similarly sized loads without difficulty and that the size and weight of the well jacket did not exceed the total barge's lifting capacity. Therefore, the district court correctly held that the extended boom and improper ballasting, when combined with the overweight and oversized well jacket and the ill-trained McCleary crew, caused the collapse at issue.

## CONCLUSION

We affirm the decision of the district court in granting judgment in favor of defendants G & B and BTI and against plaintiff JPMOC, and we dismiss the claims with prejudice. Furthermore, we affirm the district court's judgment in favor of OCI, the plaintiff in the combined case, in the amount stipulated in the pretrial order of $109,230.50 and against JPMOC, the defendant in the combined case.