2006 ME 130

**Daniel LePAGE**

v.

**BATH IRON WORKS CORP. et al.**

Supreme Judicial Court of Maine.

Argued: May 9, 2006.
Decided: Nov. 14, 2006.

Verne E. Paradie Jr., Esq. (orally), Trafton & Matzen, LLP, Auburn, for plaintiff.

Roy T. Pierce, Esq. (orally), Jeffrey W. Peters, Esq., Preti, Flaherty, Beliveau, Pachios & Haley, LLP, Bath, for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, and LEVY, JJ.

Dissent/Concurrence: CALKINS, and SILVER, JJ.

LEVY, J.

[¶ 1] Daniel LePage appeals the entry of a summary judgment in favor of Bath Iron Works Corp. (BIW) and General Dynamics Corp., contending that the Superior Court (Androscoggin County, *Gorman, J.*) erred when it ruled that LePage's disability discrimination claim pursuant to the Maine Human Rights Act (MHRA), 5 M.R.S. § 4572(1)(A) (2005), was untimely; that he failed to establish a prima facie case of disability discrimination; and that he failed to establish a prima facie case of a Maine Whistleblowers' Protection Act (MWPA), 26 M.R.S. §§ 831–840 (2005), violation. We affirm the court's decision.

## I. BACKGROUND

[¶ 2] Daniel LePage is employed as a security guard at BIW, a position he has

held since 1982. After September 11, 2001, the United States Navy required guards at certain stations to be armed. BIW thus instituted a process to qualify guards to carry firearms, which involved physical and psychological examinations and qualification at a shooting range. Joseph Wojcik, Ph.D. conducted the psychological testing for BIW, and the final qualification determination rested with BIW's Chief of Occupational Medicine, Dr. Maria Mazorra.

[¶ 3] Wojcik evaluated LePage, and although he did not diagnose LePage as suffering from a psychological disorder, he determined that LePage did not meet the criteria to carry a firearm at BIW because of his aggressive tendencies, difficulty getting along with others, inappropriate judgment and communication in times of conflict and stress, and difficulty accepting criticism. Based on Wojcik's recommendation, Mazorra deemed LePage unqualified to carry a firearm, and informed LePage of this decision by letter dated April 30, 2002. LePage met with Mazorra on May 8, 2002, at which time she informed him that she was concerned about his ability to deal with stressful situations and recommended he attend counseling to resolve this and other issues preventing his qualification.

[¶ 4] LePage obtained an independent evaluation of his personality and anger issues with Susan Chandler, Psy.D., which was submitted to Mazorra, who concluded that Chandler's report did not contradict her finding that LePage should not be armed. LePage subsequently requested and was granted a second evaluation with Wojcik. Wojcik again noted concerns regarding LePage's psychological traits as related to his job performance, and Mazorra informed LePage by letter on February 27, 2003, that he was still not qualified to carry a firearm.

[¶ 5] LePage, through his attorney, questioned BIW on its decision not to qualify him in a letter dated May 6, 2003, which claimed BIW was treating LePage differently than other guards "based on unsubstantiated and baseless allegations." In response, Kevin Gildart, Vice President of Human Resources at BIW, called LePage into a meeting with Russell Swift, a disinterested observer, on or about May 23, 2003. LePage claims that during this meeting Gildart "gave him hell" for involving an attorney, and warned him that he would face BIW's lawyers in court and would not succeed. LePage asserts that he felt compelled to apologize during the meeting and that it caused him to believe that his job was in jeopardy. BIW disputes LePage's characterization of the substance and tenor of the meeting with Gildart.

[¶ 6] In response to a meeting with LePage and his union representative, Mazorra notified LePage by a letter dated October 30, 2003, that she would not reconsider her decision regarding LePage's qualification to carry a firearm, and stated that "an endpoint ha[d] been reached." LePage continues to be employed by BIW as a security guard, but is not assigned to posts or functions that require an armed guard, pursuant to Navy regulations, and he does not receive the $2 per hour pay increase given to armed guards.

[¶ 7] LePage filed a discrimination claim on November 20, 2003, with the Maine Human Rights Commission which thereafter dismissed the claim and authorized LePage to sue. LePage then filed a complaint against BIW and its corporate parent, General Dynamics, in Superior Court on September 10, 2004. The complaint alleged discrimination based on a perceived mental disability in violation of the MHRA, 5 M.R.S. § 4572(1)(A), retaliation in violation of the MWPA, 26 M.R.S.

§§ 831–840, and intentional infliction of emotional distress.

[¶ 8] The Superior Court granted a summary judgment in favor of BIW and General Dynamics on all counts. The court determined that "BIW's willingness to allow Mr. LePage an opportunity to try to resolve the issues that made him unsuitable to carry a weapon did not create a 'chain of similar discriminatory acts.' . . . His attempts to convince BIW to amend its original decision do not extend the allegedly discriminatory act." The court concluded that because the act of alleged discrimination occurred on April 30, 2002, when BIW communicated its decision not to qualify LePage to carry a firearm, LePage's claim was time-barred because he failed to satisfy both the six-month filing deadline with the Commission under 5 M.R.S. § 4611 (2005), and the two-year deadline for filing in Superior Court pursuant to 5 M.R.S. § 4613(2)(C) (2005). The court also concluded that LePage had not demonstrated a prima facie case of discrimination because he "failed to present any evidence to support the assertion that BIW believed that his personality profile traits substantially limited him in at least one major life activity." The court found that even assuming that LePage's letter to BIW and meeting with Gildart were protected activities under the MWPA, "[a]ll of the 'adverse action' had occurred a year before either of those events," and therefore he failed to establish his prima facie case. Additionally, the court concluded that LePage's claim for intentional infliction of emotional distress was barred by the exclusivity and immunity provision of the Workers' Compensation Act, 39–A M.R.S § 104 (2005). LePage filed this timely appeal.[1]

1. On appeal, LePage does not challenge the trial court's conclusion that his claim for intentional inflection of emotional distress is barred pursuant to the Workers' Compensation Act, 39–A M.R.S. § 104 (2005).

## II. DISCUSSION

[¶ 9] This Court reviews a grant of a summary judgment de novo, taking all facts and inferences in favor of the non-moving party. *Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 2, 845 A.2d 1178, 1179. Summary judgment is appropriate when the record reveals no issues of material fact in dispute. *Id.* A fact is material if it has the potential to affect the outcome of the case. *Prescott v. State Tax Assessor*, 1998 ME 250, ¶ 5, 721 A.2d 169, 172.

### A. The Continuing Violation Doctrine

[¶ 10] LePage acknowledges that BIW's initial decision in April 2002 not to qualify him to carry a firearm occurred outside the applicable statute of limitations periods. However, LePage contends that it was not until his May 2003 meeting with Gildart that he believed he was the victim of discrimination, and that BIW's discriminatory actions did not acquire any degree of permanence until he received Dr. Mazorra's October 30, 2003, letter. LePage asserts that under the continuing violation doctrine, the applicable statute of limitations did not begin to run until he was aware of the discrimination or until BIW's decision became permanent by virtue of this final letter that affirmed that "an end point ha[d] been reached."

[¶ 11] The continuing violation doctrine arises from equitable concerns and is intended to toll applicable limitation periods until a reasonable person would have become aware of the facts supporting the claim of discrimination. *Glass v. Petro–Tex Chem. Corp.*, 757 F.2d 1554, 1560–61 (5th Cir.1985). Accordingly, a discriminatory act must have a degree of perma-

nence, sufficient to put a reasonable claimant on notice of discrimination in order to begin the limitations period. *See id.* at 1561 n. 5. Mere suspicion and rumor are insufficient to establish that the plaintiff knew or should have known of the discrimination. *See id.* at 1562.

[¶ 12] The United States Supreme Court examined the application of the continuing violation doctrine in Title VII employment discrimination cases in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Under federal law, claims of discrimination must be filed with the Equal Employment Opportunity Commission either 180 or 300 days "after the alleged unlawful … practice occurred." 42 U.S.C.S. § 2000e–5(e)(1) (LexisNexis 2005). The Court construed the word "practice" as relating to "a discrete act or single 'occurrence,' even when it has a connection to other acts." *Nat'l R.R. Passenger Corp.,* 536 U.S. at 111, 122 S.Ct. 2061. "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," with each incident constituting "a separate actionable 'unlawful employment practice,'" *id.* at 114, 122 S.Ct. 2061 from which the statute of limitations begins to run. The Court distinguished claims arising from discrete acts of discrimination from claims arising from a hostile work environment involving an aggregation of a series of acts in which the " 'unlawful employment practice' … cannot be said to occur on any particular day." *Id.* at 115, 122 S.Ct. 2061.

[¶ 13] The question for decision is whether BIW's alleged discriminatory act, initially expressed in the April 2002 letter, had reached a sufficient degree of permanence at that point in time to put LePage on notice of his duty to assert his rights under the MHRA. If so, it is properly characterized as a discrete act of alleged discrimination; if not, it is properly analyzed as the beginning point of a series of acts which, taken in the aggregate, may constitute alleged discrimination. For the reasons that follow, we agree with the court's conclusion that BIW's April 2002 decision was a discrete act of alleged discrimination from which the six-month statute of limitations established in 5 M.R.S. § 4611 began to run.

[¶ 14] As a consequence of the decision communicated by the April 30, 2002, letter, LePage knew that he had been found unqualified to carry a firearm, he did not receive a firearm, and he was denied the pay raise received by his co-workers who were found qualified to carry a firearm. LePage told Mazorra at a follow-up meeting in June 2002 that he felt "humiliated" by BIW's decision. Had LePage brought suit immediately following his receipt of Dr. Mazorra's letter, BIW would be hard-pressed to claim that LePage had not suffered adverse action in connection with BIW's response to his psychological examination.

[¶ 15] The fact that Dr. Mazorra held out hope to LePage that she would reconsider her decision if LePage obtained counseling and his circumstances changed does not alter the fact that the alleged discrimination had occurred. A discriminatory act is a discriminatory act, even if the employer represents that it may change its position if the employee's circumstances change. *See De Leon Otero v. Rubero,* 820 F.2d 18, 19–20 (1st Cir. 1987); *Velazquez v. Chardon,* 736 F.2d 831, 833 (1st Cir.1984). Dr. Mazorra's interactions with LePage resulting from her willingness to reconsider her decision did not give rise to new, discrete acts of discrimination, but were instead events resulting from the decision that gave it continuing effect. *See Del. State Coll. v. Ricks,* 449 U.S. 250, 261, 101 S.Ct. 498,

66 L.Ed.2d 431 (1980) ("The existence of [post-decision] procedures to assure fairness in [an employer's] tenure decision [regarding an employee] should not obscure the principle that limitations periods normally commence when the employer's decision is made."); *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 373 (7th Cir.2001) (concluding that an employer's subsequent refusals to reconsider its allegedly discriminatory decision does not constitute a continuing course of discrimination); *Velazquez*, 736 F.2d at 833 (recognizing that the ongoing effects of a discriminatory act do not, standing alone, establish a continuing violation). Thus, contrary to the view expressed in the dissenting opinion, the appropriate standard is not whether an employer's alleged discriminatory act has reached a state of actual or absolute finality or permanence, but rather, whether the employee has "receive[d] unambiguous and authoritative notice of the discriminatory act." *Morris v. Gov't Dev. Bank of P.R.*, 27 F.3d 746, 749 (1st Cir.1994).

[¶ 16] Dr. Mazorra's April 30, 2002, letter marks the starting point for the applicable limitations periods because it provided LePage "unambiguous and authoritative notice" of the alleged discriminatory decision of which he now complains. LePage's claims are time-barred because, as measured from the April 30, 2002, letter, his November 20, 2003, complaint to the Commission was filed more than six months after the alleged act of discrimination, 5 M.R.S. § 4611, and also because his civil action was filed with the Superior Court on September 10, 2004, more than two years after the alleged act of discrimination, *id.* § 4613(2)(C).[2]

## B. The Whistleblower Claim

[¶ 17] The court concluded that LePage had failed to establish a prima facie case under the MWPA "because the only adverse employment action was BIW's continued refusal to qualify LePage to carry a firearm" after LePage sent the letter and met with Gildart. The court did not address LePage's contention that Gildart threatened his job when they met and that threats of discharge or alteration of an employee's terms of employment are adverse employment actions prohibited by the MWPA.

[¶ 18] BIW contends that an adverse employment action is one that materially and detrimentally changes the conditions of employment, and that an unrealized threat of termination is not included in this definition. Under this view, because LePage is currently employed in the same capacity as he was prior to the Gildart meeting, he has not been subjected to an adverse employment action.

[¶ 19] The MWPA prohibits an employer from taking adverse action against an employee who reports a suspected violation of a law or rule.[3] To

2. Because we conclude that LePage's claim is time-barred, we do not address his assertion that the court also erred by concluding that he had failed to demonstrate a prima facie case of discrimination pursuant to the MHRA, 5 M.R.S. § 4572(1)(A) (2005).

3. Title 26 M.R.S. § 833 (2005) provides in pertinent part:
 1. Discrimination Prohibited. No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:
 A. The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

succeed on a claim under the MWPA, a plaintiff must demonstrate: (1) that he was engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that a causal nexus exists between the activity and the adverse action. *DiCentes v. Michaud,* 1998 ME 227, ¶ 14, 719 A.2d 509, 514. Following the shifting burdens analysis described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), once the plaintiff has shown a protected activity "followed in close proximity by an adverse employment action, [this] gives rise to an inference that a causal connection is established; the employer, then, will be required to produce some probative evidence to demonstrate a non-discriminatory reason for the adverse employment action." *DiCentes,* 1998 ME 227, ¶¶ 14, 16, 719 A.2d at 514–15. The final burden to prove the existence of the causal nexus remains with the plaintiff. *Id.* ¶ 16, 719 A.2d at 515.

[¶ 20] Actions adverse to employment are recognized as those that "adversely affect the employee's compensation, terms or other conditions of employment." *Id.* ¶ 21, 719 A.2d at 516. An employee has suffered an adverse employment action when the employee has been deprived either of "something of consequence" as a result of a demotion in responsibility, a pay reduction, or termination, or the employer has withheld "an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [the employee] for promotion after a particular period of service." *Blackie v. State of Maine,* 75 F.3d 716, 725 (1st Cir.1996).

[¶ 21] Unlike 42 U.S.C.S. § 2000e–3(a) (LexisNexis 2005), which simply pro-

hibits "discrimination" in response to a protected activity,[4] the MWPA specifically defines discrimination by stating that "[n]o employer may discharge, *threaten* or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment." 26 M.R.S. § 833(1) (emphasis added). Therefore, threats by an employer against the employee's status of employment may constitute discriminatory acts under the MWPA, without regard to whether or not the threats were actually acted upon.

[¶ 22] The plain language of the statute includes threats, but only those "regarding the employee's compensation, terms, conditions, location or privileges of employment." 26 M.R.S. § 833(1). LePage alleges that Gildart "gave him hell" about hiring a lawyer and warned him BIW would fight him in court, and that as a result of the meeting with Gildart, he felt that his job was in jeopardy. Gildart also allegedly told LePage he had to do exactly what BIW told him to do if he wanted to be qualified to carry a firearm. The question is whether these statements, viewed in the light most favorable to LePage, constitute threats against LePage's "compensation, terms, conditions, location or privileges of employment." *Id.*

[¶ 23] LePage does not claim Gildart actually threatened him with termination, only that he *felt* that his job was in jeopardy. Beginning with Mazorra's April 30, 2002, letter refusing to qualify LePage, BIW had consistently advised LePage to seek treatment for his anger issues if he wished to become qualified to carry a firearm. Gildart's reiteration of this position during the meeting does not amount to a threat that LePage's job was in jeopardy. In addition, Gildart's alleged statements

---

**4.** Title 42 U.S.C.S. § 2000e–3(a) (LexisNexis 2005) addresses "[d]iscrimination for making

charges, testifying, assisting, or participating in enforcement proceedings."

warning that BIW would fight LePage in court did not threaten LePage's employment or its terms. Apart from these alleged statements and the fact that LePage is still not qualified to carry a firearm, LePage alleges no other threats against his employment, and, in fact, he still works at BIW in the same capacity as he did prior to 2002.

[¶ 24] Taking all inferences in favor of LePage, the summary judgment record does not support the conclusion that Gildart's alleged statements to LePage amounted to threats against LePage's continued employment sufficient to satisfy the second analytical prong under the MWPA.

### III. CONCLUSION

[¶ 25] Because any discrimination LePage suffered had occurred as of his receipt of the April 30, 2002, letter, his claim under the Maine Human Rights Act was untimely. In addition, LePage did not carry his burden on his Maine Whistleblowers' Protection Act claim because he failed to demonstrate that he suffered any adverse employment effects after engaging in a protected activity.

The entry is:

Judgment affirmed.

SILVER, J., dissenting in part and concurring in part, with whom, CALKINS, J., joins.

[¶ 26] I respectfully dissent from the portion of the Court's opinion holding that the filing of LePage's complaint was untimely. Underlying this holding is the Court's conclusion that BIW's decision to disqualify LePage from carrying a firearm became final in April 2002. Because I

believe that there is a genuine issue of material fact concerning when BIW's decision actually became final, I would remand for a factual determination of that issue.

[¶ 27] BIW contends, and the Court concludes, that the decision to disqualify LePage from carrying a firearm became final in April 2002, when Dr. Mazorra notified LePage by letter that he did not meet the company's requirements to carry a firearm. The apparent impetus for the majority's conclusion is that LePage, after receiving this letter, could have brought suit immediately and BIW could not have argued that LePage had not, at that point, suffered an adverse employment action.

[¶ 28] In light of the evidence in the summary judgment record, I am not persuaded that this conclusion is clear. LePage argues that BIW's decision did not become final until October 30, 2003, when Dr. Mazorra informed him that an "endpoint" had been reached in BIW's decision-making process. In support of his contention that BIW's April 2002 determination was not its final decision, LePage cites the following portion of Dr. Mazorra's [5] deposition transcript, where she testified to her belief that the April 2002 letter did not contain BIW's final decision:

Q. Let me back up because I didn't ask you this. *In April when you originally disqualified Mr.—or determined he was disqualified, it's your understanding that wasn't a final decision;* in other words, Mr. LePage could have taken remedial action to qualify.

A. *That's correct.*

[¶ 29] In addition to this bold statement from the individual in charge of BIW's qualifying program, during a May 8, 2002,

---

5. According to BIW's statement of material facts, its firearm-qualifying program tasked Dr. Mazorra with making the final decision regarding qualification to carry a firearm based upon her professional judgment, as well as the results of physical and psychological testing that applicants were required to undergo.

meeting with LePage, Dr. Mazorra informed him that the April 30 decision was not necessarily final and that he could undertake counseling as a means of addressing the issues that were standing in his way so that he could possibly qualify in the near future. The following portion of Dr. Mazorra's deposition transcript in the summary judgment record supports this position:

Q. Was there some discussion with Mr. LePage about pursuing some type of remedial action that he could do to qualify to carry a weapon?

A. Yes. It's documented on that note.

Q. And that was your opinion that he might benefit from some counseling, correct?

A. That's correct.

Q. What type of counseling did you have in mind?

A. Counseling that would address how to deal with stressful situations, how to avoid escalation of conflict.

[¶ 30] The note to which Dr. Mazorra referred contains the following passage:

Mr. LePage is interested in pursuing remedial action to be able to qualify to carry a weapon. It is my opinion that he might benefit from some counseling, and I will review as to what individuals in the community can provide those kinds of services.... I would consider re-testing him in 3 to 6 months, but these are personality traits that are hard to change and it is unlikely that any changes would be made in a short time period. Therefore, I would recommend re-testing in 6 months.

[¶ 31] The question of when BIW's decision to disqualify LePage from carrying a firearm became final certainly affects the outcome of this case, and is, therefore, a material fact. *See Kinney v. Me. Mut. Group Ins. Co.*, 2005 ME 70, ¶ 15, 874 A.2d

880, 884. In my view, the parties' statements of material facts create a factual dispute concerning when BIW's decision regarding LePage actually became final and commenced the running of the limitations period. Considering the evidence in the light most favorable to LePage, as we must on summary judgment, *Jacques v. Pioneer Plastics, Inc.*, 676 A.2d 504, 506 (Me.1996), a genuine issue of material fact exists concerning when BIW's decision became final. Because this is a factual issue that I believe must be determined by the fact-finder, I would vacate the entry of summary judgment in favor of BIW and remand for a factual determination of finality.