STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-13-211

DANIELLE SULLIVAN,
     Plaintiff

ORDER

v.

STATE OF MAINE
Cumberland, ss, Clerk's Office

NOV 0 5 2014

RECEIVED

CATHOLIC HEALTH EAST, and
ST. JOSEPH'S REHABILITATION
AND RESIDENCE,
     Defendants

Before the court are Motions for Summary Judgment from both Defendant Catholic

Health East ("CHE") and Defendant St. Joseph's Rehabilitation and Residence ("St. Joseph's").

Defendants are seeking summary judgment on Plaintiff's Maine Whistleblower Protection Act

("WPA") claims of retaliation and constructive discharge. *See* 26 M.R.S.A. § 831 *et seq*. CHE

has joined St. Joseph's Motion as to the argument that Plaintiff Danielle Sullivan's case should

be dismissed because Ms. Sullivan did not suffer an adverse employment action. CHE is also

seeking summary judgment on separate grounds. The court held a hearing on both motions on

September 29, 2014. The court is evaluating both motions concurrently.

I.     FACTUAL BACKGROUND:

The following facts are gathered from St. Joseph's statement of material facts, Plaintiff's

opposition and additional statement of material facts, St. Joseph's reply, CHE's statement of

material facts, Plaintiff's opposition and additional statement of material facts, and CHE's reply.[1]

A. Ms. Sullivan's History with St. Joseph's

---

[1] The court notes that some of Plaintiff's additional statements of material fact were unsupported and cannot be included in the factual background, as they relied on representations Ms. Sullivan made about a supposed contractual relationship between St. Joseph's and CHE. Ms. Sullivan lacked the personal knowledge required to make representations about CHE's contractual obligations, and she actually confused or conflated CHE and CHESSM. *See* M.R. Evid. 602. The statements are properly controverted by CHE.

St. Joseph's Manor is a Maine non-profit corporation, and it is the third largest skilled nursing facility in the State. On December 7, 2009, Ms. Sullivan was hired as St. Joseph's Director of Nursing.

Ms. Sullivan reported to Administrator David Hamlin of Catholic Health East Senior Services Management ("CHESSM"), and subsequently, Roger Ledoux after he became the Administrator of St. Joseph's. Mr. Ledoux, also a CHESSM employee, reported to fellow CHESSM employees Renee Schofield and William Healy. At times, Ms. Sullivan also reported directly to Ms. Schofield.

In November of 2010, discussions of cost cutting with frontline staffing/care givers arose for the first time. Cuts for hours per patient day were mandated. Ms. Sullivan felt that cutting costs would impact residents' health and lead to either negative or potentially negative outcomes for residents. She complained regarding the cost cutting measures to Mr. Hamlin and Mr. Healy.

Ms. Sullivan also had concerns regarding not being able to express her concerns to the Board of Directors. Ms. Sullivan complained to human resources following an incident where she felt her job had been nearly threatened.

In or around September of 2011, problems with the admissions process arose. From September or October of 2011 until her resignation in May of 2012, Ms. Sullivan repeatedly raised concerns regarding admissions. She complained regarding: the admissions process generally, her belief that St. Joseph's was admitting patients without the necessary paper work or background information, and that St. Joseph's was admitting some patients whose needs she felt could not be met by St. Joseph's.

Karen Nickerson assumed the role of admissions director in March of 2012, and the admissions problems remained after her hiring. Ms. Sullivan repeatedly complained about Ms.

Nickerson, as she thought Ms. Nickerson used improper billing procedures and participated in bullying along with Ms. Schofield.

Ms. Schofield was a clinical consultant from CHESSM who provided services to St. Joseph's in February of 2012, and then began to work on site on April 19, 2012. Pursuant to Mr. Healy's request, Ms. Schofield prepared an audit and marketing plan for St. Joseph's. Together, Mr. Ledoux and Ms. Schofield completed a master plan to increase revenue.

Ms. Schofield was rude, as she failed to listen to staff, would yell at staff and would refer to staff as stupid. She and Ms. Nickerson bullied the staff. Both Ms. Schofield and Ms. Nickerson were overly critical of Ms. Sullivan, and they would rudely and harshly express their criticism. Ms. Nickerson would send Ms. Sullivan emails advising her how to perform her job. Instead of consulting with Ms. Sullivan, Ms. Schofield met with Ms. Nickerson behind closed doors.

Ms. Sullivan also felt alienated as her concerns were unaddressed, and she complained to Mr. Ledoux regarding Ms. Schofield's behavior. Ms. Sullivan also told Mr. Ledoux that changes in nursing should come from Mr. Ledoux rather than Ms. Nickerson.

In early May 2012, Ms. Sullivan started to be excluded from decision-making processes and some meetings. She was excluded from a meeting between Ms. Schofield, Mr. Ledoux and a nurse manager, where the parties discussed the transfer of the nurse manager. Ms. Sullivan was also excluded from meetings regarding admissions. In total, she was excluded from two or three meetings. In May, Ms. Schofield shuffled Ms. Sullivan's admissions responsibilities to Mr. Ledoux. For Ms. Sullivan, in May of 2012, St. Joseph's was an uncomfortable place to work.

In a meeting between Mr. Ledoux, Ms. Sullivan, and Ms. Schofield, Ms. Sullivan was accused by Ms. Schofield of not being on board with changes. Ms. Sullivan cried and told Ms. Schofield that she felt Ms. Schofield did not like her, and Ms. Schofield responded by informing

3

her that it was "ridiculous"; "this is a big girls' game, there's no crying." (SJ's S.M.F. ¶ 16.) Ms. Sullivan felt the situation was strange because she had recently been nominated for and received a National Leadership Award.

Because of the poor work environment, issues surrounding the admission's process, her exclusion from meetings, and unwarranted criticism from Ms. Nickerson and Ms. Schofield, Ms. Sullivan wanted to resign. On Friday May 18, Ms. Sullivan tendered her resignation to Mr. Ledoux, however, Mr. Ledoux persuaded Ms. Sullivan to withdraw her resignation.

Ms. Schofield and Mr. Healy (Ms. Schofield's superior) drafted a 30-day performance plan for Ms. Sullivan. On May 21, 2012, Mr. Healy told Ms. Sullivan about the plan, and on May 22, Mr. Healy issued the written plan to Ms. Sullivan. The written performance notice discussed eight areas where Ms. Schofield and Mr. Healy felt Ms. Sullivan's job performance was deficient. The notice gave Ms. Sullivan 30 days to achieve progress in the areas that it covered or face additional disciplinary action potentially including dismissal, but the plan also noted Ms. Sullivan's potential and the support available to Ms. Sullivan. Ms. Sullivan maintains that the deficiencies listed in the written plan were either inaccurate or unwarranted.

Ms. Sullivan complained about the plan to Mr. Ledoux, and she stated that she felt the plan was retaliatory. In her supervisory role, Ms. Sullivan had issued similar plans to employees, and did not consider the plans to be acts of retaliation.

During her tenure at St. Mary's, Ms. Sullivan's pay was never reduced, in fact she received a pay increase, and she was never demoted or transferred.

Ms. Sullivan resigned from her job the day after she received the written notice. Ms. Sullivan felt that she was going to be forced out and fired, so she felt that she needed to resign. After submitting her resignation, but prior to leaving St. Joseph's, Ms. Schofield informed Ms.

4

Sullivan that she could no longer undertake some of the management-level decisions regarding nursing staff. After a few days, Ms. Schofield instructed Mr. Ledoux to escort Ms. Sullivan out of the building.[2]

B. Catholic Health East, Catholic Health East Senior Services Management, and St. Joseph's

At the times relevant to this case, CHE was a Pennsylvania non-profit corporation with headquarters in Newtown Square, Pennsylvania.[3] CHE does not own St. Joseph's or any of its facilities. CHE's corporate structure does not include St. Joseph's, the two entities are not under common ownership, and no entity that controls CHE controls St. Joseph's.[4]

None of CHE's directors or officers are directors or officers at St. Joseph's. CHE has never shared offices or administrative support functions, for example human resources, with St. Joseph's. CHESSM and St. Joseph's had a contractual relationship, whereby CHESSM provided management services to St. Joseph's in exchange for a fee. CHE did not have a contractual relationship with St. Joseph's, nor did it provide services to St. Joseph's, nor did it have the authority to discipline St. Joseph's employees.[5]

---

[2] The court notes that Plaintiff stated in paragraph 58 of it additional statement of material facts to both St. Joseph's and CHE that "Ms. Schofield told Mr. Ledoux to terminate Ms. Sullivan." It is clear from the Plaintiff's filings that it is arguing that Ms. Sullivan was terminated, however, the Plaintiff's record citation to page 24 failed to support the quoted statement, and Plaintiff's allegations regarding Ms. Sullivan being terminated cannot come in.

[3] Following a merger with Trinity Health Corporation and CHE Trinity Inc., CHE is now a part of CHE Trinity Health, which is an Indiana entity, but it is headquartered in Livonia, Michigan. (CHE S.M.F. ¶ 2; Pl.'s Opp. To CHE ¶ 2.)

[4] The court notes that Plaintiff "Den[ied] that CHE had no control over SJRR. CHE has substantial control over SJRR and Ms. Sullivan." (Pl.'s Opp. to CHE ¶ 17.) Plaintiff failed to properly cite to the record to support its assertion, however. See M.R. Civ. P. 56(h)(4). Instead, the Plaintiff cited to paragraphs 1-65 of its statement of material facts. Such a citation is improper, and is not considered support for the Plaintiff's denial. See M.R. Civ. P. 56(h)(2) (requiring that each denial or qualification be supported "by a record citation as required by this rule.") The Plaintiff also cited to paragraphs 1-74 of it statement of material facts in response to CHE's statement of material facts paragraphs 18 and 20. (Pl.'s Opp. to CHE ¶¶ 18, 20.) These denials are also not properly supported, and the court is not considering them.

[5] Plaintiff claims that St. Joseph's and CHE had a contractual relationship whereby CHE oversaw St. Joseph's and provided advice and planning to St. Joseph's, however, the Plaintiff supports this claim with a citation to "Healy Dep. 6-7" and pages 6-7 of the Healy Deposition have not been presented to the court as a part of the record. (Pl.'s A.S.M.F. ¶2.) CHE also effectively controverts Plaintiff's assertion in its reply. (Id.; CHE's R.S.M.F. ¶ 2.) Plaintiff's A.S.M.F. ¶3 has the same problem, since it cites to pages eight and nice of the Healy Deposition. Page eight also has not been included as a part of the record, and thereby the assertion that "SJRR pays CHE a monthly

5

On October 31, 2012, Ms. Sullivan filed a complaint with the Maine Human Rights Commission ("MHRC") alleging retaliation by St. Joseph's in violation of Maine's Whistleblower Protection Act. Ms. Sullivan's Complaint to the MHRC alleged that Ms. Sullivan was the director of nursing at St. Josephs, and that the facility retaliated against her because she made complaints to management, the facility administrator and human resources. The MHRC Complaint only named St. Joseph's as a respondent, and it did not mention CHE. Ms. Sullivan did not amend her MHRC complaint to include claims against CHE, nor did she file an MHRC complaint against CHE.

Ms. Sullivan is not listed in CHE's records as a past employee, independent contractor, or in any other capacity. CHE and Ms. Sullivan have no contractual relationship, nor have they made any promises to one another. CHE has not paid any wages or cash compensation to Ms. Sullivan, nor reimbursed any entity for funds paid to Ms. Sullivan, nor has CHE conferred any non-cash benefits, such as health insurance, upon Ms. Sullivan. CHE has never paid taxes associated with Ms. Sullivan's employment, and it has never issued Ms. Sullivan IRS Forms 1099 or W-2. CHE has never conferred upon Ms. Sullivan the following indicia associated with employment: a CHE email address, an identification or building access card, a parking space, or other means to access CHE facilities.

II.     STANDARD OF REVIEW:

"Summary judgment is appropriate when the record reveals no issues of material fact in dispute. A fact is material if it has the potential to affect the outcome of the case." *Lepage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 9, 909 A.2d 629 (citations omitted).

---

management fee for the services" is not supported. (Plaintiff's A.S.M.F. ¶ 3.) *See also* Pl.'s A.S.M.F. to CHE ¶ 59; Pl.'s A.S.M.F. to SJ ¶¶ 2-3.

6

The Law Court has held that "[s]ummary judgment is properly granted if the facts are not in dispute or, if the defendant has moved for summary judgment, the evidence favoring the plaintiff is insufficient to support a verdict for the plaintiff as a matter of law." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18; *see also Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757. If "a defendant moves for summary judgment, the plaintiff 'must establish a *prima facie* case for each element of her cause of action' that is properly challenged in the defendant's motion." *Curtis*, 2001 ME 158, ¶ 8, 784 A.2d 18 (quoting *Champagne v. Mid-Maine Med. Ctr.,* 1998 ME 87, ¶ 9, 711 A.2d 842); *see also Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 9, 742 A.2d 933.

When considering a Motion for Summary Judgment, this court must admit uncontroverted facts from the statement of material facts that are properly supported. M.R. Civ. P. 56(h)(4). This court cannot consider parts of the record that were not properly referenced in a statement of material facts. *See* M.R. Civ.P. 56(h)(4) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."); *see also HSBC Bank USA, N.A. v. Gabay*, 2011 ME 101, ¶ 17, 28 A.3d 1158.

III.   DISCUSSION:

**A. Retaliation Claim**

"Both the MHRA and WPA seek to protect employees against discrimination by providing an avenue of recourse when they have been treated unfairly." *Fuhrmann v. Staples Office Superstore E., Inc.*, 2012 ME 135, ¶ 32, 58 A.3d 1083.

The Maine WPA provides, in pertinent part:

7

No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:

    **A.** The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States;

    **B.** The employee, acting in good faith, or a person acting on behalf of the employee, reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual. …

26 M.R.S. § 833(1).

"'To prevail on a [Whistleblowers' Protection Act] claim, an employee must show that (1) he engaged in activity protected by the WPA; (2) he experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.'" *Hickson v. Vescom Corp.*, 2014 ME 27, ¶ 17, 87 A.3d 704 (quoting *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 12, 915 A.2d 400) (alteration in the original).

St. Joseph's confines its Motion to disputing the Plaintiff's claim based on the second prong. St. Joseph's argues that summary judgment should be granted in its favor, as Ms. Sullivan cannot prove that she suffered any adverse employment action. Defendant CHE has joined in co-Defendant St. Joseph's Rehabilitation and Residence's Motion for Summary Judgment with respect to the argument that Ms. Sullivan never suffered any adverse employment action.

The WPA provides that "[n]o employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment", as a result of protected activity. 26 M.R.S.A. § 833(1).

8

The Law Court has held that its "construction of the MHRA and WPA has been guided by federal law . . . ." *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 13, 915 A.2d 400.

"An adverse employment action is one that 'materially change[s] the conditions of plaintiffs' employ.'" *Higgins v. TJX Companies, Inc.*, 331 F. Supp. 2d 3, 6-7 (D. Me. 2004) (quoting *Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir.2002)). The United States District Court for the District of Maine has held that an adverse employment action usually requires that an "employer must either take something of consequence from the employee, or withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." *Paquin v. MBNA Mktg. Sys., Inc.*, 233 F. Supp. 2d 58, 67 (D. Me. 2002)(quotation omitted). "The First Circuit has specifically mentioned the following as adverse employment actions: demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Davis v. Emery Worldwide Corp.*, 267 F. Supp. 2d 109, 120 (D. Me. 2003). The First Circuit has held that a reprimand that results in "tangible consequences" can be considered an adverse employment action. *Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011).

St. Joseph's argues that retaliatory action under the WPA is more constricted than it would be under the MHRA or under federal law. In *Burlington Northern & Santa Fe Ry. Co. v. White*, the Supreme Court distinguished the Title VII anti-discrimination provision of the Civil Rights Act from the anti-retaliation provision of the Civil Rights Act in terms of what types of actions were prohibited under each provision. 548 U.S. 53 (2006). Based on the language in the Act and the purpose behind each provision, the anti-discrimination provision required that the discrimination be workplace related, while the anti-retaliation provision did not. *Id.* at 62-67. Ms.

9

Ms. Sullivan has argued that the more expansive approach to retaliatory action should be adopted where the court looks to whether a "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (quoting *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (C.A.D.C.2006)). The MWPA wording most closely resembles the more narrowly construed antidiscrimination provision, however, as the District Court noted in *Thayer Corp. v. Reed*, "The *Burlington Northern* opinion . . . cuts both ways; its linguistic analysis supports a limited application of the MWPA while its statutory purpose analysis supports a broad interpretation of the MWPA." 2011 WL 2682723, at *21 (D. Me. July 11, 2011). It is unclear therefore how the principles of *Burlington Northern* should apply to the MWPA. What remains clear are the requirements of § 833.

In *LePage.*, the Law Court distinguished the MWPA from the federal anti-retaliation provision. 2006 ME 130, ¶ 21, 909 A.2d 629. The Law Court held, "Unlike 42 U.S.C.S. § 2000e–3(a) (LexisNexis 2005), which simply prohibits 'discrimination' in response to a protected activity, the MWPA specifically defines discrimination by stating that '[n]o employer may discharge, *threaten* or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment.'" *Id.* (quoting 26 M.R.S. § 833(1)).

Ms. Sullivan has made a prima facie case of an adverse employment action. In particular, Ms. Sullivan's exclusion from meetings, combined with the criticism she faced[6], and the written performance plan could, when viewed in the light most favorable to the Plaintiff, constitute adverse employment action involving the condition of her employment. *See Rodriguez-Vives v.*

---

[6] Taken individually, the criticism and rudeness Ms. Sullivan faced from Ms. Schofield and Ms. Nicholson would not rise to the level of an adverse employment action.

10

*Puerto Rico Firefighters Corps of Puerto Rico*, 743 F.3d 278, 285-86 (1st Cir. 2014) (where the court on a motion to dismiss in a federal retaliation claim viewed the plaintiff's allegations cumulatively, rather than individually.) In *Valentin-Almeyda v. Municipality Of Aguadilla*, 447 F.3d 85, 97 (1st Cir. 2006), the 1st Circuit described admonishment letters received soon after expressed complaints as adverse employment actions. At the same time, however, the 7th Circuit has held that in *Agnew v. BASF Corp* that a performance improvement plan coupled with unfair criticism was not tantamount to an adverse employment action through constructive discharge. 286 F.3d 307, 310-11 (6th Cir. 2002). The court agrees that Ms. Sullivan's performance plan would not constitute constructive discharge, but it is possible that a fact-finder could find that a plan based upon unwarranted criticism threatening Ms. Sullivan with dismissal in 30 days if she failed to meet expectations, *coupled* with Ms. Sullivan's other allegations, rises to the level of an adverse employment action.

## B. Constructive Discharge

Ms. Sullivan, however, has not made a prima facie case for her constructive discharge claim. To prove constructive discharge, a plaintiff must be able to show a hostile work environment. *Bodman v. Maine, Dep't of Health & Human Servs.*, 787 F. Supp. 2d 89, 110 (D. Me. 2011. ) The Law Court has held "[h]ostile environment claims involve repeated or intense harassment sufficiently severe or pervasive to create an abusive working environment." *Doyle v. Dep't Of Human Servs.*, 2003 ME 61, ¶ 23, 824 A.2d 48, 56. "'Constructive discharge' usually describes harassment so severe and oppressive that staying on the job while seeking redress is intolerable." *Bodman.*, 787 F. Supp. 2d 89, 109 (D. Me. 2011) (quotation omitted). "When determining whether a hostile work environment claim exists, the court must look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically

11

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Blake v. State*, 2005 ME 32, ¶ 8, 868 A.2d 234, 237-38 (quotations and citations omitted). The court must gauge whether the harassment is so severe that it creates an abusive or hostile workplace. *Id.* ¶ 9. . The court must make determinations regarding whether the workplace was subjectively and objectively abusive or hostile. *Id.*

Plaintiff's facts provide inadequate support for a constructive discharge claim. In no way was the environment at St. Joseph's abusive or intolerable in the manner required for a hostile work environment claim, let alone a constructive discharge claim. Ms. Schofield and Ms. Nickerson may have been rude and callous towards Ms. Sullivan and members of the staff, but their behavior as documented by Ms. Sullivan did not rise to the level of abuse. Ms. Sullivan was able to continue bringing her complaints to the attention of her employer up until she left her position. Nor has Ms. Sullivan shown that she was on the verge of being fired, in fact she had thirty days to improve under the written performance notice. See *Agnew*, *286* F.3d 307, 310 (6th Cir. 2002) ("An employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged.") Count II of Ms. Sullivan's claim is thereby dismissed.

**C. Catholic Health East's Motion for Summary Judgment**

In addition to concurring with St. Joseph's assertion that Ms. Sullivan's case should be dismissed because Ms. Sullivan did not suffer any adverse employment action, CHE has also moved for summary judgment independently. Ms. Sullivan has sued the wrong entity. CHE has demonstrated that it had no contractual relationship with St. Joseph's, it did not provide services to St. Joseph's, and that Ms. Sullivan confused CHE with CHESSM.

CHE argues that Plaintiff's case against CHE should be dismissed, since Ms. Sullivan was never an employee of CHE, and Ms. Sullivan never had any contractual or other type of

12

relationship with CHE. As a result, Ms. Sullivan could not have suffered an adverse employment action as a result of CHE. The court agrees.

Furthermore, CHE argues that Ms. Sullivan did not present a charge against CHE to the MHRC, and thereby she has not exhausted her administrative remedies with respect to CHE. Ms. Sullivan's Complaint to MHRC did not even mention CHE. In *Thornton v. United Parcel Serv., Inc.,* the court explained:

> the scope of the investigation rule permits a district court to look beyond the four corners of the underlying administrative charge to consider collateral and alternative bases or acts that would have been uncovered in a reasonable investigation. ... The rule does not, however, provide a plaintiff with an unlimited license to extend his claim endlessly beyond the bounds and parameters encompassed by the administrative charge. Indeed, such an extension of the scope of the investigation rule would effectively nullify the administrative exhaustion requirement and convert it into a simple notice requirement that some claim may be brought, thereby depriving employers of the opportunity to resolve issues at an early stage and rendering the EEOC (and state-level equivalents) superfluous.

587 F.3d 27, 32 (1st Cir. 2009) (citation omitted.)

Pursuant to 5 M.R.S.A. § 4622, a plaintiff's remedies are severely limited if the plaintiff has not filed a complaint with the Commission and the Commission has not taken certain actions enumerated in the statute. Under § 4622, such a plaintiff cannot recover attorney's fees, civil penal damages, compensatory damages, or punitive damages. *See also, Gordan v. Cummings,* 2000 ME 68, ¶ 11, 756 A.2d 942 ("Before a plaintiff with a MHRA claim may recover attorney fees and damages, the plaintiff must establish that she first brought a claim before the Maine Human Rights Commission."). CHE asks that the court dismiss the claims where the Plaintiff has requested attorney's fees and compensatory and punitive damages. This court agrees with CHE that even if Plaintiff had a relationship with CHE, and CHE had somehow caused her to suffer an adverse employment action, Plaintiff did not exhaust her administrative remedies with regard to

13

CHE and thereby could not collect compensatory, punitive or civil penal damages, or attorney's fees.

It is unnecessary for this court to reach Plaintiff's joint employer argument, since CHE clearly could not have been a joint employer with St. Joseph's when CHESSM, not CHE, is the entity that had the contractual and working relationship with St. Joseph's. The court thereby grants CHE's Motion, as it is clear that the Plaintiff sued the wrong entity, and CHE could not have inflicted an adverse employment action upon Ms. Sullivan.

Accordingly, the court **ORDERS** that Plaintiff's retaliation claim survives St. Joseph's summary judgment motion and shall proceed to trial. The court grants summary judgment in favor of St. Joseph's on Plaintiff's constructive discharge claim, which is now dismissed. The court also grants summary judgment in favor of CHE, and CHE is dismissed from this action.

The clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: _November 5, 2014_

Hon. Roland A. Cole
Justice, Superior Court

14

DANIELLE SULLIVAN VS CATHOLIC HEALTH EAST
UTN:AOCSsr  -2013-0044157                          CASE #:PORSC-CV-2013-00211
------------------------------------------------------------------------------

01 0000003340            HADDOW, JAMES
    2 MONUMENT SQUARE SUITE 900 PO BOX 17555 PORTLAND ME 04112-8555
    F     ST JOSEPHS REHABILITATION AND RESIDENCE   DEF        RTND    07/24/2013
    F     CATHOLIC HEALTH EAST                       DEF        RTND    07/24/2013
                                                               W/DRWN  02/19/2014

02 0000009294            LORANGER, GUY D
    ONE GRANNY SMITH COURT SUITE 3 OLD ORCHARD BEACH ME 04064
    F     DANIELLE SULLIVAN                          PL         RTND    05/17/2013

DANIELLE SULLIVAN VS CATHOLIC HEALTH EAST
UTN:AOCSsr  -2013-0044157                    CASE #:PORSC-CV-2013-00211
------------------------------------------------------------------------

03 0000008551        O'KEEFE, MARGARET MINISTER
   MERRILLS WHARF 254 COMMERCIAL ST PORTLAND ME 04101
   F      CATHOLIC HEALTH EAST              DEF       RTND    02/13/2014
                                                      W/DRWN  08/05/2014


04 0000009629        RAND, KATHARINE I
   MERRILLS WHARF 254 COMMERCIAL ST PORTLAND ME 04101
   F      CATHOLIC HEALTH EAST              DEF       RTND    03/20/2014

05 0000004874        REICHL, NOLAN L